(Not for Publication)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

_____

SANFORD WILLIAMS, JR. and          :
JAMES WILLIAMS                     :
                                   :
          Plaintiffs,              :      Civil No. 05-4129 (RBK)
                                   :
          v.                       :      **OPINION**
                                   :
EDWARD PETER DELLORCO, et al.      :
                                   :
          Defendants.              :
_____   :

**KUGLER**, United States District Judge:

    Presently before the Court is a motion by defendants Edward Peter Dellorco, Michael May, Thomas LaRosa, and Edward G. Begolly ("Lumberton Defendants") for summary judgment against plaintiffs Sanford Williams, Jr. and James Williams ("Plaintiffs").  Further before the Court is a motion by defendant Drew Cooke for summary judgment against Plaintiffs.  Plaintiffs' claims, brought pursuant to 42 U.S.C. § 1983, stem from incidents surrounding their November 15, 2004 arrest on suspicion of attempted burglary.  For the reasons set forth below, the Court will grant in part and deny in part Defendants' motions.

## I.    BACKGROUND

    In the early morning hours of November 15, 2004, Plaintiffs were in the vicinity of 84 Lumber Company in Lumberton, New Jersey.  Plaintiffs state that they were in the area because

they had experienced engine trouble and in the course of walking to find help, stopped to relieve themselves in an area of trees abutting the 84 Lumber parking lot.  Officers May and Dellorco arrived at 84 Lumber at 2:09 a.m., reportedly in response to an activated silent burglar alarm on the premises.  (Cooke Br. Ex. G.)  As they began to investigate, Officers May and Dellorco shined their flashlights in the direction of a noise they heard and observed Plaintiffs in the trees next to the parking lot, between thirty and seventy-five yards from where they stood.  (Id.; Cooke Br. Ex. E at 255.)  Plaintiffs then started running in the direction of an adjacent parking lot and Officers May and Dellorco chased them.  (Pls.' Opp'n ¶ 10.)  Officers May and Dellorco reported that during the chase, they yelled "police" and "stop"; however, Plaintiffs claim they could not decipher anything the officers said, did not know their pursuers were police officers, and that they ran out of fear for their safety.  (Pls.' Opp'n ¶ 11; Cooke Br. Ex. C at 192-93.)

The chase ended when Plaintiffs tired after about a hundred yards.  Once they stopped running and turned to face their pursuers, Plaintiffs realized, allegedly for the first time, that they were being chased by police officers.  (Cooke Br. Ex. C at 196.)  Plaintiffs attest that they then peacefully complied with the officers' orders to lay down on the ground.  Plaintiffs claim further that as soon as they were on the ground, the officers started assaulting them.  Specifically, James Williams testified that Officer May twisted his arm behind his back, causing excruciating pain, and that both Officers May and Dellorco participated in jumping on him and punching and kicking him in the sides.  (Cooke Br. Ex. E at 268-72.)  In addition to purportedly suffering punches and kicks, Sanford Williams testified that he told Officer Dellorco he had an injured shoulder and asked Officer Dellorco not to hurt him.  Officer Dellorco allegedly reacted by intentionally twisting his arm, causing further injury to his shoulder.  (Cooke Br. Ex. C at 197-

2

98.)  Plaintiffs also allege that instead of providing Plaintiffs medical care, Officers Dellorco, May, and Cooke left them handcuffed on the ground for twenty minutes.  (Id. at 200.)

Defendants' account is to the contrary.  Officer Dellorco's police report states that James Williams fell while fleeing and then refused to follow police instructions to stay down, show his hands, and stop resisting arrest.  (Lumberton Br. Ex. C.)  By Officer Dellorco's account, Officer May had to wrestle James Williams to the ground and struggle with him for approximately fifteen seconds in order to place handcuffs on him.  (Cooke Br. Ex. G.)  Sanford Williams also reportedly failed to satisfactorily obey police orders, so Officers Dellorco and Cooke had to struggle with him for approximately ten seconds to get him on the ground and handcuffed.  (Id.)  Defendants recovered a two-way radio, a set of car keys on a Cadillac chain, and a flashlight from James Williams's person and a bag containing tools near where he was arrested.  (Id.)

Following their arrests, Plaintiffs complained that they needed medical attention, so at 2:53 a.m., Defendants requested that paramedics meet Plaintiffs on their arrival at the police station.  (Lumberton Br. Ex. C.)  The paramedics' reports reveal that Sanford Williams indicated pain in his right shoulder and that James Williams's chief complaint was that he felt dizzy and faint.  Subsequently, Officer May and another officer not named in Plaintiffs' action transported Plaintiffs to Virtua Memorial Hospital.  (Id.)  There, Sanford Williams testified he had his blood pressure taken, got an EKG test, received a shot for pain, and was given a sling for his arm.  (Cooke Br. Ex. D at 230-34.)  The record does not reveal what treatment James Williams received at the hospital.  Sanford Williams further testified that the treating physician told Officer May that it was necessary for Sanford Williams to have the sling, yet once they returned to the police station, Officer May took it away from him.  (Id. at 234-35.)  Following the visit to the

3

hospital, Sanford Williams filed an excessive force complaint in connection with his arrest. (Lumberton Br. Ex. F.)  In that complaint, Sanford Williams reported his injured right shoulder and described the arrest.  (Id.)

Two days after Plaintiffs' arrests, on November 17, Officer Dellorco returned to the 84 Lumber parking lot and discovered a crowbar, gloves, and another two-way radio in the area where Sanford Williams was arrested.  (Id.)  Additionally, Officer Dellorco received a phone call from a George Wilmore who inquired about a Cadillac belonging to his brother-in-law. (Lumberton Br. Ex. C.)  Mr. Wilmore reported that Sanford Williams had called to tell him that Sanford had been arrested in Lumberton and that his car had been impounded for being illegally parked on Route 38.  (Id.)  The license plate number and description provided by Mr. Wilmore matched that of a Cadillac registered in Sanford Williams's name.  Thereafter, Sergeant Begolly located the car parked behind a business on Route 38 in Southampton Township, not far from 84 Lumber.  After consulting with the county prosecutor's office, Sergeant Begolly had the car towed to the police impoundment lot.  On November 24, Detective LaRosa obtained a search warrant for the vehicle based on an affidavit attesting to the facts surrounding Plaintiffs' arrests. (Id.)  The vehicle was towed to police headquarters where Detective LaRosa and Sergeant Begolly executed the search warrant and seized gloves, tools, and some records from the car. (Id.)

On July 14, 2005, Plaintiffs were indicted on five counts: attempted burglary, conspiracy to commit burglary, resisting arrest by physical force or violence, resisting arrest, and obstruction.  (Lumberton Defs.' Reply at Ex. D.)  On December 22, 2006, Plaintiffs signed a full and final release and settlement agreement, which was part of Plaintiffs' agreement to plead

guilty to the lesser charge of criminal trespass.  (Cooke Br. Ex. H.)  The terms of the agreement, among other things, released all officers, employees, and agents of Lumberton Township Police Department from any and all claims, including claims for violations of civil rights, "in consequence of an incident or incidents that occurred on or after November 17, 2004."  (Id.)  In consideration for Plaintiffs' release of claims, Defendants returned Sanford Williams's Cadillac. (Id.)  Defendants assert that the date of November 17 in the release was a typographical error and that all parties to the release intended the date to read November 15, the date of Plaintiffs' arrests. Plaintiffs contend that their understanding at the time they signed the release was that they were only releasing Defendants from liability stemming from incidents on or after November 17. (Pls.' Opp'n at 20.)

On August 22, 2005, Plaintiffs brought the following claims against Defendants: (1) Officers Dellorco, May, and Cooke, while acting under the color of state law, violated Plaintiffs' right to be free from the use of excessive force under the Fourth Amendment of the United States Constitution; (2) Officers Dellorco, May, and Cooke exhibited deliberate indifference to Plaintiffs' serious medical needs in violation of the Fourteenth Amendment; (3) Officers Dellorco and May, Sergeant Begolly, and Detective LaRosa discriminated against them in violation of the Fourteenth Amendment;[1] and (4) Officer Dellorco, Sergeant Begolly, and Detective LaRosa seized and searched Sanford Williams's car without probable cause that it was involved in criminal activity; and Detective LaRosa obtained a search warrant without probable cause and seized property from the car that was not described in the warrant or involved in a

---

[1]  In response to Defendants' summary judgment motions, Plaintiffs abandoned their claim of discrimination.  (Pls.' Opp'n at 4.)  As a result, there is no need for the Court to address this claim, and it will be dismissed.

crime, thereby violating Plaintiffs' Fourth Amendment rights.  Both the Lumberton Defendants and Officer Cooke move for summary judgment as to all claims.  Plaintiffs oppose the motion.

## II.    STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986).  A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could find for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  When the Court weighs the evidence presented by the parties, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. at 255.

The burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment.  Celotex, 477 U.S. at 330.  The moving party may satisfy this burden by either (1) submitting affirmative evidence that negates an essential element of the nonmoving party's claim; or (2) demonstrating to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's case.  Id. at 331.

Once the moving party satisfies this initial burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).  To do so, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Rather, to survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

III.    **DISCUSSION**

   A.      **The Release Agreement**

   Defendants have failed to meet their burden in seeking to enforce the release signed by

Plaintiffs, so the release will not bar any of Plaintiffs' claims.  The release at issue in this case is

analogous to a release-dismissal agreement.  A release-dismissal agreement is an agreement in

which a criminal defendant waives potential civil claims in exchange for the dismissal of the

criminal case against him.  Livingstone v. N. Belle Vernon Borough, 91 F.3d 515, 519 (3d Cir.

1996).  Here, even though the terms of the release itself refer only to Sanford Williams's

Cadillac, the release was a part of a plea deal involving a reduction of the criminal charges

against Plaintiffs and the dismissal of a forfeiture action against the Cadillac.  (Cooke Br. Ex. H.)

Because the same legal issues and relevant public interests are at issue in both release-dismissal

agreements and releases procured by a reduction in charges, case law concerning the former is

also applicable to the latter.  Davis v. Ort, 42 F. Supp. 2d 465, 471 (D.N.J. 1999).

   "A promise is unenforceable if the interest in its enforcement is outweighed in the

circumstances by a public policy harmed by enforcement of the agreement."  Town of Newton v.

Rumery, 480 U.S. 386, 392 (1987).  The party seeking to enforce a release-dismissal agreement

must demonstrate that: (1) objectively, "the facts known to the prosecutor when the agreement

was reached . . . sufficed to support the prosecutor's proffered public interest reason for

concluding the agreement" and that the public interest reason is a legitimate one; and (2)

subjectively, "the public interest proffered by the prosecutor is the prosecutor's actual reason for

seeking the release."  Davis, 42 F. Supp. 2d at 472 (citing Livingstone, 91 F.3d at 527).

Additionally, a defendant must establish the voluntariness of the release-dismissal agreement by

clear and convincing evidence.  Id. at 474 (citing Livingstone, 91 F.3d at 534).

Defendants argue that the release signed by Sanford and James Williams entitles them to summary judgment on all of Plaintiffs' claims and contend that despite the typographical error, the spirit and wording of the agreement evince that all parties intended the release to include claims arising out of the events that occurred on or after November 15.  Plaintiffs respond that their understanding in signing the release was that it only applied to claims relating to events on or after November 17.  Regardless of the import of the agreement, however, Defendants have not carried their burden of showing the requisite public interest factors of the Third Circuit test for the enforcement of release-dismissal agreements.  Specifically, Defendants fail to demonstrate that the facts known to the prosecutor at the time the agreement was executed were adequate to support the public interest reason motivating the agreement; that the public interest reason was legitimate; and that the public interest proffered by the prosecutor was the prosecutors's actual reason for seeking the release.  See id. at 472.

Furthermore, while Plaintiffs stipulate to the voluntariness of the release as it pertains to claims stemming from events on or after November 17, disputed issues of fact remain as to whether Plaintiffs voluntarily waived their claims in connection with the events of November 15.  Plaintiffs attest that their lawyers told them more than once that Plaintiffs were not waiving claims from November 15.  Accordingly, the release agreement does not entitle Defendants to summary judgment on any of Plaintiffs' claims.

### B.    Qualified Immunity

Government officials who are accused of violating a person's constitutional rights while performing discretionary functions are entitled to qualified immunity.  Qualified immunity

shields officials "from liability from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  This analysis is two-fold.  First, the court is to assess whether the facts as alleged by the plaintiff amount to a constitutional violation. If this test is met, the court then determines whether the right is "clearly established." Saucier v. Katz, 533 U.S. 194, 200-01 (2001); Kopec v. Tate, 361 F.3d 772, 775-76 (3d Cir. 2004).  In other words, before engaging in a determination of whether a right is clearly established, the court must first determine whether a constitutional violation has occurred, because "[i]f the plaintiff fails to make out a constitutional violation, the qualified immunity inquiry is at an end; the officer is entitled to immunity." Id. at 776 (quoting Bennett v. Murphy, 274 F.3d 133, 136 (3d Cir. 2002)). Therefore, this Court must first assess Plaintiffs' claims to determine whether any amount to a violation of their constitutional rights.  Only if such a finding is made does this Court then proceed to analyze whether the right violated was clearly established.

> 1.   Fourth Amendment

>> a.   Excessive Force

Defendants are not entitled to summary judgment on Plaintiffs' claim that Officers Dellorco, May, and Cooke used excessive force against them because, construing the evidence in Plaintiffs' favor, material issues of fact remain surrounding Plaintiffs' arrests.  The Fourth Amendment prohibits a police officer from seizing a citizen except on probable cause.  Albright v. Oliver, 510 U.S. 266, 274-75 (1994).  The Fourth Amendment's objective reasonableness standard controls where a police officer allegedly uses excessive force during an arrest.  Graham v. Connor, 490 U.S. 386, 397 (1989).   To establish a claim for excessive force as an

9

unreasonable seizure, a plaintiff must show that a seizure occurred and that the seizure was

unreasonable.  Rivas v. City of Passaic, 365 F.3d 188, 198 (3d Cir. 2004) (citing Curley v. Clem,

298 F.3d 271, 279 (3d Cir. 2002)).  Proper application of this objective reasonableness standard

"requires careful attention to the facts and circumstances of each particular case, including the

severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the

officers or others, and whether he is actively resisting arrest or attempting to evade arrest by

flight."  Saucier, 533 U.S. at 205.  Ultimately, "the question is whether the officers' actions are

'objectively reasonable' in light of the facts and circumstances confronting them, without regard

to their underlying intent or motivation."  Here, it is stipulated that a seizure occurred, so the

remaining question concerns the reasonableness of that seizure.

At the summary judgment stage, a court must "consider only those facts alleged by [the

plaintiff], taken in the light most favorable to him."  Rivas, 365 F.3d at 199.  Thus, "a police

officer who is accused of having used excessive force is not precluded from arguing that he

reasonably perceived the facts to be different from those alleged by the plaintiff, but that

contention . . . must be considered at trial."  Id. (citation and internal quotation marks omitted).

When viewed in the light most favorable to Plaintiffs, the facts to which Plaintiffs

testified are sufficient to support a claim for excessive force.  Plaintiffs testified at their

depositions that even though they initially ran, as soon as they recognized their pursuers as police

officers, they peacefully complied with the instructions of Officers May and Dellorco to lay down

on the ground.  Plaintiffs further testified that once they laid down, the police officers wrenched

their arms behind their backs and kicked and punched them for approximately one minute.  In

addition to their testimony, Plaintiffs offer their records from the paramedics, and Sanford

Williams submits his Virtua Hospital records from the night of the arrest to support their account of events.  Because these facts, as alleged, give rise to a constitutional violation, the Court will analyze the second prong of the qualified immunity analysis to determine whether the right asserted was clearly established.

b.      Seizure of Sanford Williams's Car

Defendants are entitled to summary judgment on Plaintiffs' claim that Officer Dellorco and Sergeant Begolly seized Sanford Williams's car without probable cause, since the undisputed facts demonstrate that Defendants had probable cause to seize the car.

The Supreme Court has found that the impoundment and inventory search of a vehicle pursuant to standard criteria of "reasonable police regulations" does not run afoul of the Fourth Amendment prohibition of unreasonable searches and seizures.  Colorado v. Bertine, 479 U.S. 367, 368-69 (1987).  Furthermore, police may seize a car without a warrant if there exists probable cause to believe the car contains evidence of a crime.  Acevedo v. California, 500 U.S. 565, 579 (1991); California v. Carney, 471 U.S. 386, 394 (1985).  The role of a court reviewing a determination of probable cause is to ensure that there was a "substantial basis" for concluding that probable cause existed based on the totality of the circumstances known to the officer at the time.  See Massachusetts v. Upton, 466 U.S. 727, 728 (1984) (per curiam); Illinois v. Gates, 462 U.S. 213, 238 (1983).

Plaintiffs have presented no evidence suggesting that the seizure was carried out contrary to standard criteria of police regulations.  But more significantly, the uncontroverted evidence demonstrates that Defendants had probable cause to seize Sanford Williams's car.  Officer Dellorco and Sergeant Begolly knew the car was registered in Sanford Williams's name, that

Sanford and James Williams had been arrested on suspicion of attempted burglary two days earlier, that the car had been parked in its location since the morning of their arrest, that James Williams had been carrying Cadillac car keys at the time of his arrest, and that someone purporting to be Sanford Williams's brother-in-law had informed police that a Cadillac belonging to Sanford Williams was parked off of Route 38, which is where Sergeant Begolly located the car. These facts certainly amounted to a substantial basis for concluding that Defendants had probable cause to impound the car. As a result, Plaintiffs suffered no constitutional violation stemming from the November 17 seizure of Sanford Williams's car.

c.      Search of Sanford Williams's Car

Plaintiffs allege that on November 24, 2004, Detective LaRosa obtained a search warrant without probable cause. In particular, Plaintiffs challenge the truthfulness of several statements in Detective LaRosa's affidavit, which provided the basis for the magistrate's determination of probable cause. Plaintiffs also claim that Detective LaRosa and Sergeant Begolly seized property that was not described in the warrant or involved in a crime in violation of their Fourth Amendment rights. Defendants again dispute that Plaintiffs have offered any evidence to support their contentions. Plaintiffs have not proffered sufficient evidence to maintain their claim of a Fourth Amendment violation in connection with the search of Sanford Williams's car, thus Defendants are entitled to summary judgment.

i.      The Veracity of the Warrant Application

Even assuming Defendants are correct that the warrant application contained three false statements, they cannot satisfy their burden of showing that the misstatements were deliberate or reckless. Nor can Defendants show that absent the purportedly false statements, the magistrate

12

would have lacked sufficient evidence to make a finding of probable cause.

Challenges to the validity of a search warrant based on allegations that the accompanying affidavit contains material false statements are governed by Franks v. Delaware, 438 U.S. 154 (1978).  Where a magistrate has issued a warrant, the supporting affidavit is entitled to a presumption of validity.  Id. at 171.  The party disputing the veracity of the warrant application can challenge the validity of the warrant by making a substantial preliminary showing that the affiant deliberately or recklessly included in the underlying affidavit falsehoods concerning material facts necessary to the determination of probable cause.  Id. at 155-56.  If the defendant establishes falsity by a preponderance of the evidence, the false statements will be stricken from the affidavit and the court will determine whether the information remaining in the affidavit is sufficient to support a finding of probable cause.  Id.  Courts have employed the Franks analysis in § 1983 claims for Fourth Amendment violations.  Jones v. Town of Seaford, Del., 661 F. Supp. 864, 873 (D. Del. 1987) (citing Krohn v. United States, 742 F.2d 24, 26 (1st Cir. 1984)).

Plaintiffs first allege it was false that they were found to be in possession of burglar's tools at the time of their arrest.  To the contrary, Plaintiffs assert that they were never in possession of burglar's tools and that Defendants failed to prove they ever possessed such tools. Even assuming that this is true, however, Plaintiffs do not to show that Detective LaRosa deliberately or recklessly included his assertion that Plaintiffs had burglar's tools with them at the time of their arrests.  Detective LaRosa presumably relied on the several police reports filed by Officers Dellorco, May, and Sergeant Begolly reporting the recovery of burglar's tools during Plaintiffs' arrests.  According to November 15 police reports by Officer May and Officer Dellorco, a search incident to the arrest of James Williams revealed car keys, a flashlight, and a

13

two-way radio.  Their reports added that approximately three feet from where they arrested James

Williams, they found a backpack containing screwdrivers, hacksaws, blades, a small

sledgehammer, bolt cutters, a hatchet, a flashlight, and gloves.  Additionally, on November 17,

Sergeant Begolly reported finding two gloves, a crowbar, and a second two-way radio in the area

where Sanford Williams was arrested.

Plaintiffs state accurately that it was never proved beyond a reasonable doubt that they

had burglar's tools.  Nonetheless, based on these reports, it was not unreasonable for Detective

LaRosa to state that Plaintiffs were found to be in possession of burglar's tools in supporting his

application for a warrant to search Sanford Williams's car.  Police routinely rely on the reports of

their colleagues in carrying out investigations.  Therefore, there is no evidence that Detective

LaRosa acted deliberately or recklessly in swearing to facts memorialized in the police reports

concerning Plaintiffs' arrests.

Second, Plaintiffs dispute the veracity of the statement that they had thirty or more felony

convictions.  They admit that they had previously pled guilty to ten burglaries each as part of a

plea bargain.  (Pls.' Attached Sheet at 10.)  Even were Plaintiffs to prove by a preponderance of

the evidence that Detective LaRosa recklessly or intentionally included this falsehood, however,

the magistrate still would have had ample basis for finding probable cause to issue the warrant

based on their ten convictions each as well as the other facts submitted by Detective LaRosa.

Finally, Plaintiffs state that they were not charged with burglary and theft in connection

with their November 15 arrest, contrary to Detective LaRosa's averment.  The relevant charging

documents appear to support Plaintiffs' contention, since the documents list criminal attempt,

obstruction, resisting arrest, and possession of burglar's tools as the exclusive charges against

Plaintiffs stemming from their November 15 arrest.  (Lumberton Br. Ex. C.)  Nevertheless, Plaintiffs have adduced no evidence suggesting that Detective LaRosa's list of the charges was more than mere inadvertence.  Moreover, even if shown to be deliberate or reckless on Detective LaRosa's part, were the true charges substituted in the warrant application for the erroneous charges, the magistrate still would have had sufficient evidence to issue the warrant.  The fact remains that Detective LaRosa presented evidence that Plaintiffs had committed five offenses under the laws of New Jersey.

As a result, even if Detective LaRosa's affidavit did contain the three false statements alleged by Plaintiffs, Plaintiffs have not surmounted the burden they bear in challenging the magistrate's determination.  Plaintiffs have adduced no evidence indicating that Detective LaRosa intentionally or recklessly made false statements in his affidavit, nor is there any evidence that those statements were material to the finding of probable cause.

ii.     Lack of Particularity

The Court finds that Detective LaRosa and Sergeant Begolly acted reasonably in seizing items from Sanford Williams's car.  The Fourth Amendment requires that a search warrant "particularly describ[e] the place to be searched, and the persons or things to be seized."  U.S. Const. Amend. IV.  The Supreme Court has held "[i]f the scope of the search exceeds that permitted by the terms of a validly issued warrant . . . the subsequent seizure is unconstitutional without more."  Horton v. California, 496 U.S. 128, 140 (1990).  Under the plain view doctrine, however, law enforcement officers can exceed the original scope of the search warrant when they are engaged in an otherwise lawful search and inadvertently discovery contraband or other items, the incriminating nature of which is immediately apparent.  Id. at 135.  To show that a law

15

enforcement official is not entitled to qualified immunity with regard to the execution of a search warrant, the party disputing the legality of the search must establish that from the perspective of a reasonably objective police officer on the scene, without regard to their actual intent or motivation, their conduct was not objectively reasonable.  Graham v. Connor, 490 U.S. 386, 396-97 (1989).

Plaintiffs have failed to show how any of the items seized were beyond the scope of the search warrant.  The warrant incorporated the warrant application, which enumerated the items Detective LaRosa believed he had probable cause to seize, including burglar's tools and "other evidentiary items used in the commission of burglary and theft."  (Lumberton Br. Ex. C.)  The items seized from the car included fifteen pairs of gloves, a crow bar, a flashlight, tin snips, an electronic wire tester, a phone bill, and bail bond business cards.  Given the content of the search warrant and the known circumstances giving rise to the search, objectively reasonable police officers could have believed that the items seized were of such an incriminating nature as to constitute evidence of criminal activity.  See Walden v. Carmack, 156 F.3d 861, 873 (1998) (citing United States v. Weinbender, 109 F.3d 1327, 1330 (8th Cir. 1997) (stating probable cause does not require certainty but only that the facts available to a reasonably cautious person would merit a belief that the items seized may be contraband, stolen property, or useful as evidence of a crime).  Consequently, the facts as alleged by Plaintiffs do not amount to a constitutional violation, and Defendants are entitled to summary judgment on Plaintiffs' Fourth Amendment claim stemming from the search of Sanford Williams's car.

2.      Fourteenth Amendment

For pretrial state detainees, claims based on conditions of confinement and for denial of

16

medical care are considered under the due process clause of the Fourteenth Amendment rather

than the Eighth Amendment.  City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 243-45 (1983).

Under the Fourteenth Amendment analysis, the proper inquiry is whether the conditions of

confinement or inadequate medical treatment amounted to punishment prior to an adjudication of

guilt.  Montgomery v. Ray, 145 F. App'x 738, 740 (3d Cir. 2005).

a.     Denial of Medical Attention

In previous cases, the Third Circuit has applied the Eighth Amendment standard set forth

in Estelle v. Gamble, 429 U.S. 97 (1976) when evaluating whether a claim for inadequate

medical care by a pretrial detainee is sufficient under the Fourteenth Amendment.  Natale v.

Camden County Corr. Facility, 318 F.3d 575, 581 (3d Cir. 2003) (citation omitted).  This Court

will therefore evaluate the Fourteenth Amendment claims for inadequate medical care under the

Eighth Amendment standard.

To establish a violation of the right to adequate medical care under the Eighth

Amendment, a prisoner "must show (i) a serious medical need, and (ii) acts or omissions by

prison officials that indicate deliberate indifference to that need."  Id. at 582.  The Third Circuit

has held that a medical need is deemed to be serious if it is "one that has been diagnosed by a

physician as requiring treatment or one that is so obvious that a lay person would easily

recognize the necessity for a doctor's attention."  Lanzaro, 834 F.2d at 347 (quoting Pace v.

Fauver, 479 F. Supp. 456, 458 (D.N.J. 1979)).  Alternatively, a plaintiff can establish the

existence of a serious medical need "if unnecessary and wanton infliction of pain . . . results as a

consequence of denial or delay in the provision of adequate medical care."  Atkinson v. Taylor,

316 F.3d 257, 266 (3d Cir. 2003) (citing Lanzaro, 834 F.2d at 347).  The Third Circuit has cited

17

with approval other appellate courts that have held that a refusal to provide medical care – or even a delay in providing such care – constitutes deliberate indifference. Id. at 346-47 (citing Ancata v. Prison Health Servs., 769 F.2d 700, 704 (11th Cir. 1985); Archer v. Dutcher, 733 F.2d 14 (2d Cir. 1984); Robinson v. Moreland, 655 F.2d 887, 889-90 (8th Cir. 1981); Todaro v. Ward, 565 F.2d 48, 53 (2d Cir. 1977)).

An official may be found deliberately indifferent where he "knows of and disregards an excessive risk to inmate health or safety." Natale, 318 F.3d at 582 (quoting Farmer, 511 U.S. at 837 (1994)).  Where a police officer "den[ies] reasonable requests for medical treatment . . . and such denial exposes the inmate to undue suffering or the threat of tangible residual injury, deliberate indifference is manifest." Lanzaro, 834 F.2d at 347.  In addition, deliberately delaying necessary medical care when the delay causes an increased risk of harm constitutes deliberate indifference that is actionable. Id.

i.    Alleged Delay in Medical Care

The twenty minutes that elapsed while Plaintiffs were handcuffed on the ground prior to Officers Dellorco, May, and Cooke calling an ambulance did not amount to deliberate indifference to Plaintiffs' serious medical needs.  Sanford Williams testified that during the time he and James Williams were handcuffed on the ground, they complained to Defendants that they needed to be taken to a hospital and that Defendants ignored them. (Cooke Br. Ex. D at 357.) Once the officers were en route with Plaintiffs to the police station twenty minutes later, Defendants called for a paramedics squad.  (Cooke Br. Ex. G)  Paramedics evaluated Plaintiffs immediately upon their arrival at Lumberton's police station, and at 4:00 a.m., Officer May and another officer transported Plaintiffs to Virtua Memorial Hospital where they were seen by

18

emergency room physicians and medically cleared for incarceration.

At the time of Defendants' alleged indifference, Plaintiffs' complaints had not been diagnosed by a physician as requiring treatment.  Furthermore, Plaintiffs have adduced no evidence that their alleged injuries were so obvious that a lay person would easily recognize the necessity of a doctor's attention.  Accordingly, they can only meet the standard by establishing that Defendants deliberately delayed twenty minutes before calling paramedics, thereby causing Plaintiffs unnecessary and wanton infliction of pain.  See Atkinson, 316 F.3d at 266.  This Court finds that under the circumstances, Defendants' twenty-minute delay in calling paramedics is not sufficient to make out such a claim.  Cf. Davis v. Township of Paulsboro, 421 F. Supp. 2d 835, 857 (D.N.J. 2006) (finding no Fourteenth Amendment violation where plaintiff who was bleeding from head was seen by paramedics "within minutes" of arriving at police station); Mantz v. Chain, 239 F. Supp. 2d 486, 504 (D.N.J. 2002) (finding no deliberate indifference where less than an hour and a half elapsed before trooper called ambulance following the plaintiff's exposure to pepper spray).  Additionally, Plaintiffs do not present any evidence that the alleged delay in medical treatment caused an increased risk of harm.  See Lanzaro, 834 F.2d at 347.  Thus, the Court will award summary judgment on this claim.

ii.      Alleged Denial of Medical Equipment

Plaintiffs have adduced evidence creating a triable issue of fact regarding whether Officer May exhibited deliberate indifference to Sanford Williams's serious medical needs by depriving him of his sling.  Sanford Williams testified that the doctor who treated him at Virtua Memorial Hospital ordered that he have a sling to immobilize his arm.  According to Sanford Williams, the doctor told Officer May that the sling was necessary, but when they returned to the police station,

19

Officer May removed the sling and took it away from him.  (Cooke Br. Ex. D at 234, 236.)  Also, Sanford Williams's medical records from the visit instruct him not to remove the sling before a follow-up examination.  (Lumberton Br. Ex. E.)  Sanford Williams's testimony makes clear that the sling was ordered for him by a medical doctor, thus meeting the threshold for a "serious medical need" set forth in Lanzaro.  Plaintiffs must also show that Officer May acted with deliberate indifference, in that he intentionally deprived Sanford Williams of this medical equipment, rather than acting inadvertently or in a merely negligent fashion.  Estelle, 429 U.S. at 105-06.  Plaintiffs allege that Officer May was present when the doctor at the hospital ordered the sling and that the doctor instructed Officer May that the sling was necessary.  If Officer May had such knowledge, then his actions would be intentional, and thus rise to the level of deliberate indifference.  Therefore, the Court will progress to the second prong of the qualified immunity analysis and determine whether the right claimed by Sanford Williams was clearly established.

> b.      Denial of Food

> In evaluating a Fourteenth Amendment claim arising out of conditions of confinement,

> > a court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose.  Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on "whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]."  Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment."

Bell v. Wolfish, 441 U.S. 520, 538-39 (1979) (citations omitted).  Nevertheless, "[t]he conditions of imprisonment . . . do not reach even the threshold of constitutional concern until a showing is made of 'genuine privations and hardship over an extended period of time.'"  Duran v. Elrod,

760 F.2d 756, 759 (7th Cir. 1985) (quoting Bell, 441 U.S. at 542)).

The record suggests that Plaintiffs were not given any food between the time of their arrest and when they arrived at the Burlington County jail around noon the same day. Thus, Plaintiffs were without food for ten hours while in custody. Even accepting, as Plaintiffs allege, that Defendants withheld food as a means of "playing hardball" with them for declining to make statements to police, ten hours without food does not meet "the threshold of constitutional concern." Effectively, Plaintiffs missed breakfast on one occasion, which does not amount to a deprivation under the Fourteenth Amendment. Accordingly, Defendants are entitled to summary judgment on this claim.

3.       Whether the Rights are Clearly Established

Since Plaintiffs have alleged sufficient facts to substantiate claims of excessive force in violation of their Fourth Amendment rights and denial of medical equipment in violation of Sanford Williams's Fourteenth Amendment rights, this Court must progress to the second prong of the qualified immunity analysis and determine whether the rights were clearly established. The Supreme Court has determined that such a finding hinges on "whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 202.

a.       Fourth Amendment

Accepting the facts as alleged by Plaintiffs, the Court concludes that it would have been clear to reasonable officers that punching and kicking compliant, handcuffed suspects was prohibited. According to Plaintiffs, they obeyed police orders once they realized the identities of their pursuers. Plaintiffs contend that after Defendants Dellorco, May, and Cooke had secured

21

them in handcuffs, they assaulted Plaintiffs causing them excruciating pain.  Once Plaintiffs were handcuffed, any threat they might have once posed was neutralized.  Consequently, reasonable officers in this particular situation would have known that such use of physical force was impermissible.  Thus, Plaintiffs present a triable issue of fact as to the reasonableness of their seizure by Officers Dellorco, May, and Cooke on November 15, 2004.

> b.    Fourteenth Amendment

Given the allegations made and substantiated by plaintiff Sanford Williams, Officer May did not lack information as to the medical necessity of Sanford Williams's sling.  Sanford Williams claims that Officer May inquired as to whether the sling was necessary and that the doctor answered that it was.  Given this awareness of the medical necessity of the sling, it would have been clear to Officer May that he was depriving a pretrial detainee of a medical device.  Given further the Third Circuit's holding in <u>Lanzaro</u>, Officer May had the requisite awareness that such an act constituted a violation of that inmate's Fourteenth Amendment rights.  Therefore, this Court finds that Sanford Williams has provided a triable issue of fact regarding the deprivation of his sling following his treatment at Virtua Memorial Hospital and will therefore deny Defendants' motion for summary judgment on this issue.

## IV.    CONCLUSION

For the foregoing reasons, the Court will deny the Lumberton Defendants' motion for summary judgment regarding (1) Plaintiffs' claim of excessive force by Officers Dellorco and May in violation of Plaintiffs' Fourth Amendment rights; and (2) Sanford Williams's claim that Officer May allegedly depriving him of his sling constituted deliberate indifference to his serious medical need and consequently violated his rights as guaranteed by the Fourteenth Amendment.

Additionally, the Court will deny defendant Cooke's motion for summary judgment on Plaintiffs' claims of excessive force in violation of Plaintiffs' Fourth Amendment rights.  In all other respects, Defendants' motions for summary judgment are granted.  An accompanying order shall issue today.


Dated: 11/20/07                                                 s/ Robert B. Kugler
                                                            ROBERT B. KUGLER
                                                            United States District Judge

23